**ONE THOUSAND FRIENDS OF IOWA, et al., Plaintiffs,**

v.

**Norman Y. MINETA, et al., Defendants.**

**No. Civ. 4–02–CV–10168.**

United States District Court, S.D. Iowa, Central Division.

Nov. 22, 2002.

Deborah M. Tharnish, William J. Koehn, Sharon K. Malheiro, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, John Britton, Schnader Harrison Segal & Lewis LLP, Washington, DC, for Plaintiffs.

Maureen McGuire, United States Attorney, Des Moines, IA, David A. Ferree, Mark Hunacek, Iowa Attorney General Counsel Div–DOT, Ames, IA, Edward W. Remsburg, Ahlers & Cooney PC, Des Moines, IA, for Defendants.

## ORDER

LONGSTAFF, Chief Judge.

THE FOLLOWING MOTIONS ARE BEFORE THE COURT: 1) plaintiffs' May 15, 2002 motion for preliminary injunction;[1] 2) defendants' June 11, 2002 motion to consolidate the final hearing on the action on the merits with the preliminary injunction hearing; 3) plaintiffs' June 21, 2002 objection to Magistrate's Order; and 4) plaintiffs' August 9, 2002 motion to

---

1. On May 28, 2002, plaintiffs filed an additional motion for a temporary restraining order and requested an immediate hearing. During a May 31, 2002 telephone conference with the Court, however, counsel for plaintiffs agreed that a hearing was unnecessary until the administrative record was prepared and filed with the Court. Accordingly, plaintiffs agreed to allow the Court to consider their motion for temporary restraining order on the pleadings, and to schedule an evidentiary hearing on the motion for preliminary injunction for June 24, 2002, after the administrative record had been submitted. The Court issued an Order denying plaintiffs' motion for temporary restraining order on June 7, 2002.

expand the administrative record and addendum to plaintiffs' brief.[2] The motions are fully submitted and considered below.

## I. BACKGROUND AND GOVERNING LAW

The background of this matter, as well as applicable law, is fully outlined in this Court's June 7, 2002 Order denying plaintiffs' motion for a temporary restraining order, and will be repeated only as needed to support the Court's present analysis.

## II. DISCUSSION

### A. Preliminary Matters

1. Plaintiffs' Objection to Magistrate's Order

■ On June 21, 2002, plaintiffs filed an objection to an Order issued on June 18, 2002 by Chief United States Magistrate Judge Ross Walters, which granted the federal defendants' earlier motion for a protective order concerning plaintiffs' scheduled deposition of Franklin D. Howell, the Federal Highway Administration ("FHWA") official who signed the Finding of No Significant Impact ("FONSI") document on behalf of the agency's division administrator. Specifically, Judge Walters found there was "no evidence to this point that FHWA has acted in a biased, arbitrary or capricious manner in its oversight of the NEPA process." June 18, 2002 Ruling at 3 (citing this Court's June 7, 2002 Order denying plaintiffs' motion for a temporary restraining order). Absent a "strong showing of bad faith or improper behavior," Judge Walters therefore declined to allow discovery "into the mental processes of administrative decisionmakers." June 18, 2002 Ruling at 2–3 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

In support of their objection, plaintiffs cite to *Sierra Club v. Sigler,* 695 F.2d 957, 963 (5th Cir.1983) and *Citizen's Alert Regarding the Env't v. United States Dep't of Justice,* Civ. A. No. 95–1702(GK), 1995 WL 748246 (D.D.C. Dec. 8, 1995) for the proposition that this Court should examine the conduct of the applicants as well as the reviewing federal agency for evidence of bad faith or bias. Both cases are factually distinguishable from those at issue in the present case.

In *Sierra Club,* the administrative record suggested the federal agency at issue, the Army Corps of Engineers, conducted a scanty review of the proposed document before actually issuing the Environmental Impact Statement ("EIS"). *Sierra Club,* 695 F.2d at 962 n. 3. Evidence that the consulting firm used by the applicant had a financial interest in the project further compounded the court's concerns. *Id.* In the present case, however, as discussed in this Court's June 7, 2002, Order and below, this Court finds the FHWA was integrally involved in the NEPA process from the initial stages of the project, and was far more than a "rubber stamp," as plaintiffs suggest.

*Citizen's Alert* turned not on evidence of bad faith or bias, but on alleged insufficiencies in the NEPA review process. In *Citizen's Alert,* the federal agency at issue, the Bureau of Prisons, chose the site of the proposed project, a prison, itself—before any environmental issues were considered. *Citizen's Alert,* 1995 WL 748246 at * 7. The court held this fact resulted in a "preordained conclusion" that the Bureau would later accept any environmental impact statement submitted. *Id.* The court also found factual evidence of rare vegetation that would be destroyed if the prison

---

**2.** Plaintiffs' motion for preliminary injunction was not fully submitted until late July, when the parties filed their post-hearing memoranda.

was built on the proposed site, and that regional planning issues did not support development in the area. *Id.* at *5.

No such factual evidence exists in the present case. Unlike the Bureau of Prisons in *Citizen's Alert,* the FHWA functioned appropriately as a third-party reviewer. The City of West Des Moines and the Iowa Department of Transportation ("IDOT")-not the FHWA-initiated and supported the present interchange improvements. There is no evidence the FHWA had a personal interest in the project in any respect.

In summary, although the Court agrees it cannot review the FHWA's conduct in a vacuum, there is nothing to suggest the conduct of other parties caused the FHWA to fail in its duties under NEPA. Accordingly, the Court declines to allow plaintiffs to go on a "fishing expedition" outside the scope of the administrative record. *See Overton Park,* 401 U.S. at 420, 91 S.Ct. 814 ("inquiry into the mental processes of administrative decisionmakers is ... to be avoided" absent strong evidence of bad faith or improper behavior). Judge Walters' June 18, 2002 Order granting the protective order with regard to Mr. Howell's deposition is neither clearly erroneous nor contrary to law. FED R. CIV. P. 72(a) (setting forth standard of review for magistrate judge's nondispositive pretrial ruling); *see also Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 763 (8th Cir.1995).

2. Plaintiffs' Motion to Expand the Administrative Record

■ On August 9, 2002, plaintiffs filed a motion to expand the administrative

record and addendum to plaintiffs' posthearing brief. Specifically, plaintiffs seek to incorporate into the administrative record a document dated March 1, 2002, entitled "Summary of Considerations and Decisions." The document, which was prepared by Bobby Blackmon, the Administrator of the Federal Highway Administration ("FHWA"), apparently was signed shortly after the Finding of No Significant Impact ("FONSI") was issued by the Deputy Administrator, Frank Howell. The Summary purports to summarize the FHWA's involvement in the project at issue and "actions leading to the signing of the [FONSI]." Exh. A to Motion to Expand Administrative Record at 2.

The federal defendants submitted a response to plaintiffs' motion, which has been joined by the state defendants and City of West Des Moines, arguing that because the document was not considered by the FHWA in making its determination to issue the FONSI, it should not be made a part of the administrative record. *See, e.g., Bar MK Ranches v. Yuetter,* 994 F.2d 735, 739 (10th Cir.1993) (for purposes of 5 U.S.C. § 706, administrative record "consists of all documents and materials directly or indirectly considered by the agency"). Although the Court agrees in theory with defendants' argument, it notes that several other documents originating *after* March 1, 2002 *were* included in the record. Giving plaintiffs the benefit of the doubt, therefore, the Court grants plaintiffs' motion to expand the administrative record to include the Summary.[3]

---

**3.** The Court rejects plaintiffs' request for an investigation into whether defendants improperly concealed other relevant documents. It is clear from the cover letter drafted by Assistant United States Attorney Maureen McGuire, as well as the federal defendants' response to plaintiffs' motion to expand the record, that the FHWA considered in good faith whether to produce the summary, and reasonably concluded it did not fall within the definition of "administrative record." The fact this Court granted plaintiffs' motion and agreed to consider the document with regard to this Order, does not mean it believes the FHWA was incorrect in its initial decision not to produce the document.

B. Law Governing Preliminary Injunctive Relief

As outlined in the Court's June 7, 2002 Order, four factors must be considered in determining whether to grant preliminary injunctive relief: 1) plaintiffs' probability of success on the merits; 2) the threat of irreparable harm to plaintiffs; 3) the balance between this harm and potential harm to others if relief is granted; and 4) whether an injunction serves the public interest. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485 (8th Cir.1993) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981)).

C. Probability of Success on the Merits

1. Count I: Alleged Violation of NEPA and the APA

In Count I of their complaint, plaintiffs contend that the FWHA's reliance on the Environmental Assessment ("EA") to issue its FONSI was arbitrary, capricious, and not in accordance with law, thereby in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* Complaint at ¶ 79. The APA provides in relevant part that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Pursuant to this standard, an agency action will not be found arbitrary and capricious unless "the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Central S.D. Coop. Grazing Dist. v. Secretary of U.S.D.A.*, 266 F.3d 889, 894 (8th Cir.2001). "APA review

of agency action is normally confined to the agency's administrative record." *Newton Cty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 807 (8th Cir.1998).

The majority of the arguments raised by plaintiffs during the June 24, 2002 hearing and in their post-hearing brief were addressed by this Court in its June 7, 2002 Order. Because additional evidence is now available through the administrative record, however, the Court will revisit each issue as appropriate.

a. Involvement by City of West Des Moines, IDOT and General Growth Properties

As with their motion for temporary restraining order, plaintiffs continue to urge the Court to focus its analysis on the alleged manipulative conduct of West Des Moines, the Iowa Department of Transportation ("IDOT") and General Growth Properties ("GGP"), the developer of the proposed Jordan Creek Town Center. A necessary prerequisite exists, however, to the consideration of such conduct. Although the Court agrees in theory that the FHWA's participation in this project did not occur in a vacuum, any biases or undue pressure on the part of West Des Moines, IDOT or GGP do not become relevant until plaintiffs have *first* proven that the FHWA failed to fulfill its statutory duties under NEPA.

As stated in this Court's June 7, 2002 Order:

[Th]e general NEPA regulations expressly authorize the agency to designate preparation of an EA to the applicant for public action. *See* 40 C.F.R. § 1506.5(b). The FHWA's own NEPA regulations also *require* that the FHWA work closely with all interested parties and the public from the early stages of a project to ensure all necessary information is gathered. 23 C.F.R. § 771.111

("Early coordination with appropriate agencies and the public aids in determining the type of environmental document an action requires, the scope of the document, the level of analysis, and related environmental requirements. This involves the exchange of information *from the inception of a proposal for action* to preparation of the environmental document.") (emphasis added).

June 7, 2002 Order at 8.

In short, the FHWA did not act arbitrarily, capriciously or in violation of the law by delegating the environmental investigation to the State and City defendants. The administrative record, even as expanded by the March 1, 2002 Summary prepared by defendant Blackmon, fails to establish that the FHWA had a preconceived opinion regarding the project, or otherwise succumbed to any pressure placed upon it by the other defendants. In their motion to expand the administrative record to include this summary, plaintiffs highlight certain language suggesting that the FHWA blindly acquiesced in IDOT and West Des Moines' efforts to "thwart" the environmental review process. *See* Motion to Expand Administrative Record and Addendum to Plaintiffs' Post Hearing Brief at 4 (noting the FHWA, "at the insistence of IDOT and West Des Moines, had 'to accelerate the project development process with a goal of having the projects constructed when the mall opened' and, in a similar vein, the 'suggestion was made the Iowa DOT and City expressed the desire to advance the projects in an expeditious manner without having to back up and prepare additional studies and because the potential impacts … was unknown.' "). Plaintiffs have taken this language out of context.

As previously held by this Court, proponents of the intersection improvements made no secret of the fact they were contractually obligated to expedite the construction to accommodate the proposed Mall. This fact alone does not establish any wrongdoing on the part of the FHWA, however. After reading the language plaintiffs excerpted from the Summary in context, it becomes clear the FHWA agreed to cooperate with the approach suggested by the City and IDOT expressly upon the condition that if significant environmental impacts were uncovered during preparation of the EA, a full Environmental Impact Statement ("EIS") would need to be prepared:

> In addition, we [the FHWA] suggested they [IDOT and the City] proceed with the development of an Environmental Impact Statement ("EIS") that includes the limits outlined for the traffic study. This suggestion was made because the Iowa Dot and City expressed the desire to advance the projects in an expeditious manner without having to back up and prepare additional studies and because the potential impacts of work needed to address the potential significant increase in traffic volumes within the corridor was unknown.
>
> The Iowa Dot and City indicated they did not feel the environmental impacts would be significant and preferred to proceed with the development of an Environmental Assessment. FHWA agreed to this approach with the understanding that both interchanges would be addressed in the same document, along with any other required work on the interstate *and that if significant impacts were identified as the required environmental studies were being completed, an EIS would have to be prepared.*

Exh. A to Plaintiffs' Motion to Expand Administrative Record at 2–3 (emphasis added).

A further indication that the FHWA was not overly influenced by the City's or de-

velopers' timeline is the fact the FHWA *rejected* the first EA prepared in June 2001, *see* 13 AR 6187–6237,[4] which caused the IDOT to hire an environmental consultant to rework the initial document and prepare a second EA on August 31, 2001. *See* 6 AR 1884–89 (Draft of August 31, 2001 EA). Following the FHWA's initial review and comment regarding this second EA, *see* 7 AR 2356, necessary revisions, *see* 7 AR 2358, 2458–60, and the required public comment period, *see* 7 AR 2580–91 (November 28, 2001 letter from Bobby Blackmon, FHWA division administrator, to plaintiffs' counsel, Neil Proto, acknowledging receipt of comments, and noting the public comment period was still open); 7 AR 2609–30 (copy of actual coments), the FHWA did not issue the FONSI until March 1, 2002–eight months following the date initially targeted by defendants and their consultants.[5]

b. Division of Roadway Improvements

Plaintiffs also allege defendants erroneously "segmented" the project in three ways: (i) by preparing separate analyses for the 74th Street/I–80 and Mills Parkway/I–35 interchanges; (ii) by eliminating the 105th Street/I–80 interchange from the environmental review; and (iii) by failing to include the proposed "Mega Mall" in the scope of the environmental review.

(i) Separate Environmental Documents

■ Plaintiffs first challenge the fact that separate EAs initially were prepared for the 74th Street/I–80 and Mills Parkway/I–35 interchanges and then combined. Plaintiffs contend the EAs should have been combined from the beginning, and

that the FHWA's attempt to avoid the segmentation issue by combining the documents at the end was arbitrary and capricious. This Court does not agree.

Improper "segmentation" or "piecemealing" is an attempt by an agency to artificially divide a "major federal action" into smaller components to escape the application of NEPA to some of its segments. *Barton Creek Ass'n v. FHWA*, 950 F.2d 1129, 1139 (5th Cir.1992) ("improper segmentation almost always involves a situation where a 'major Federal action' is found to exist and *then* the segmentation is evaluated as an escape from the NEPA application which is otherwise immediate") (emphasis in orig.). In the present case, however, it is clear the FHWA intended to consider the combined environmental impact caused by both interchange expansions from the initial stages of the project. Although the FHWA ultimately authorized the preparation of separate EAs for the 74th Street and Mills Civic Parkway interchanges, it did so upon condition that the EAs would be submitted in one "umbrella-type" document that satisfactorily addressed the combined impact of both projects. *See* 3 AR 501–05 (meeting minutes of March 15, 2000 meeting to coordinate environmental documentation process).

As explained by the FHWA in the FONSI:

The Iowa DOT and FHWA initially pursued the 74th Street and George Mills interchanges independently.... The decision to combine the interchange projects into one environmental document was to give a system context to the

---

**4.** Copy of initial EA submitted June 28, 2001, with handwritten comments from FHWA representative.

**5.** As evidence of defendants' undue influence on the NEPA process, plaintiffs point to a January 11, 2001 meeting in which defendants and their consultants developed a time-

line for preparation of the EA, the date on which it would be approved, the date for a hearing, and the date on which a FONSI would be issued. *See* 12 AR 5794–98 (establishing a target date for the FONSI as July 1, 2001). Clearly, these timeframes were not given much credence by the FHWA.

projects.... The fact that the projects were started independently has no bearing on the outcome of the analysis, nor segmentation. Frankly, it is not uncommon for projects to be started independently, and then later combined as a single environmental document. FONSI, Section 2, Part A, Response to Interest Group Comments at 2–3. Absent evidence the FHWA failed to review the combined effects of the two interchange projects, the Court finds its authorization of the initial preparation of two EAs was neither arbitrary, capricious, nor in violation of the applicable regulations.[6]

### (ii) Elimination of 105th Street Interchange

■ Plaintiffs also challenge defendants' elimination of the proposed interchange at 105th Street and I–80 from the environmental review process. Plaintiffs claim this interchange was considered a necessary component of the traffic analysis for the overall region. Again, however, plaintiffs focus their discussion on the conduct and motivation of the City and IDOT to remove this proposed interchange from the environmental review process.

The record shows that although the FHWA initially suggested that the environmental investigation conducted with regard to the proposed mall project may need to include the proposed 105th Street interchange, see 2 AR 470–472 (minutes of March 2, 2000 traffic meeting prepared by FHWA representative Max Grogg with draft of letter to IDOT recommending all three interchange projects be included in one interchange justification report ("IJR")), the FHWA subsequently determined that inclusion of the 105th Street interchange was dependent on whether the 74th Street interchange could successfully manage increased traffic flow on its own. See 10 AR 4613–15 ("Contact Record" prepared March 9, 2000 by consultants WHKS & Co.); 12 AR 5791–92 (meeting minutes from January 9, 2001 project meeting).

The FHWA then suggested that the project proponents conduct a study to evaluate this issue, see 3 AR 777–80 (meeting minutes from July 27, 2000 to discuss elements of interchange justification review). Results of the study were reviewed and approved by the FHWA. See 13 AR 6372 (interchange justification report as approved by FHWA). As explained by the FHWA in the FONSI: "The 105th Street Interchange was not included in the 74th St./George Mills EA because the timing of the interchange is beyond the implementation period of the 74th St./George Mills projects. This fact, combined with the rationale that 105th Street has independent utility, explains its absence from the 74th

---

6. Relevant FHWA regulations provide that:
 In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:
 (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
 (2) Have independent utility or independent significance, *i.e.*, be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.
23 C.F.R. § 771.111(f). In the present case, the fact both the 74th Street and Mills Parkway interchanges were proposed long before the GGP mall project suggests the two interchanges had independent utility and significance, and could in fact have been considered as mutually exclusive projects, subject to independent EAs. *See id.* § 771.111(f)(2). The fact the FHWA nevertheless recognized the potential environmental impact of the combined projects further detracts from plaintiffs' segmentation argument.

St./George Mills EA." *See* FONSI, Section 2, Part A; Interest Group Comments p. 2–3, Exh. B. to Plaintiffs' App. As stated in its June 7, 2002 Order: "The Court finds this explanation is both consistent with the regulations and reasonable under the circumstances. Absent specific evidence the FWHA's conduct in this regard was somehow arbitrary and capricious, the Court finds plaintiffs' argument does little to advance their claims under Count 1." June 7, 2002 Order at 10. *See also Save Barton Creek Ass'n,* 950 F.2d at 1139 (agency's decision to separately consider related interchange projects will be invalidated only when each project has no independent utility). *See* 23 C.F.R. § 771.111(f) (setting forth guidelines for preparation of environmental document in conjunction with major federal projects).

### (iii) Failure to Consider Mall Development

 Plaintiffs' third segmentation argument stems from what they claim was an inappropriate separation of the interchange projects from the GGP mall development. Plaintiffs argue that because the development of the "Mega Mall" was not a speculative, future concept at the time the EAs were prepared, it should have been considered in the EA for its cumulative impact. This Court disagrees.

There is no evidence in the record the FHWA is involved in the development of the "Mega Mall" in any way. That the proposed Mall may have caused the City of West Des Moines to expedite completion of the interchange improvements does not render the Mall a federal agency "project" subject to NEPA review requirements. *See Save Barton Creek Ass'n,* 950 F.2d at 1133 ("The requirements of NEPA ... apply only when the federal government's involvement in a project is sufficient to constitute 'major Federal action.'") (citing 42 U.S.C. § 43332(2)(C)). The record clearly supports a finding that develop-

ment of the 74th Street/I–80 and Mills Parkway/I–35 interchanges was imminent-even if the Mall project fell through. Plaintiffs argument on this issue is without merit.

### c. FHWA's Alleged Failure to Consider Environmental Justice

 Plaintiffs also contend the EA, and therefore, the FHWA, failed to consider the potential impact of the projects on low income and minority communities. Plaintiffs' argument is based on language found in an Executive Order issued in February 1994 by then President Clinton. *See* 59 Fed.Reg. 7629 (Feb. 11, 1994). This Order stated that the FHWA should attempt to achieve "environmental justice" whenever possible when carrying out its various transportation projects. *Id.* at 7629.

Plaintiffs' "environmental justice" argument was thoroughly evaluated by this Court in its June 7, 2002 Order. As stated in the June 7, Order, the concept of "environmental justice" is not a fundamental right, and does not alone give rise to judicial review by this or any other court. *See id.* at 7633 (Executive Order issued by President Clinton expressly states it "shall not be construed to create any right to judicial review involving compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order"); *see also, Sur Contra La Contaminacion v. E.P.A.,* 202 F.3d 443, 449 (1st Cir.2000) (agency's alleged noncompliance with Executive Order on Environmental Justice not appropriate for judicial review).

Although not legally bound to consider the issue, however, the administrative record establishes that the FHWA did in fact address issues of environmental justice at several stages of the environmental review process. *See, e.g.,* 10 AR 4637–38 (FHWA

discussed with applicants the type of environmental justice analysis that would be included in the EA or EIS). The FHWA also received and responded to comments from plaintiffs regarding socio-economic issues during the review process. *See* FONSI, Section 2 at 16–18 (portion of FONSI addressing environmental justice); 2894–97 (December 1, 2001 letter from 1000 Friends President LaVon Griffieon expressing concern about effects of development on farmland and rural communities); 11 AR 5024–25 (June 28, 2000 letter to Mark Wandro of IDOT from State Representative Ed Fallon echoing comments made by LaVon Griffieon; letter was subsequently copied to management team). In addition, the FONSI itself outlined several transportation projects then underway or contemplated in the Des Moines metropolitan area, dispelling plaintiffs' argument that resources were not being equitably distributed. FONSI, Section 2, Part A, Response to Interest Group Comments at 16–18.

Clearly, plaintiffs are not satisfied with the FHWA's analysis of this issue. This dissatisfaction does not prove the FHWA acted in an arbitrary and capricious manner, however. As summarized in the FONSI:

> While we do not dispute the claim that a new highway can result in major influx of people to a new commercial and retail center, it must be understood that West Des Moines has enjoyed freeway access since 1958. In the case of a mature transportation system, it is unlikely that a single additional access point along the network would have more than a negligible impact on relocation. In truth, business relocation is a natural part of the free market and capitalist system. The development in West Des Moines is not the cause of relocation from the city, but rather a symptom of decentralization; a

process far beyond the control of the proposed projects.
*Id.*

d. Alleged Failure to Consider Alternatives

██ Lastly, plaintiffs contend the EA is inadequate because it failed to consider certain reasonable alternatives, such as mass transit, a flyover ramp for the 74th Street/I–80 interchange, a light rail and a "no-build" alternative. This Court disagrees.

Under the applicable regulations, an EA must include only "a brief discussion of . . . alternatives." 40 C.F.R. § 1508.9(b). In the present case, the EA expressly discussed several alternatives to the two interchange improvements, including: (1) improving the 74th Street interchange only; (2) different interchange designs; and (3) no action. FONSI, Section 3, Environmental Assessment at 2–1 through 2–5. Although the EA did not expressly consider light rail and mass transit alternatives, light rail and mass transit expressly were considered during the initial stages of the planning process. *See* 1 AR 3482–83 (report issued by Des Moines Metropolitan Planning Organization regarding non-viability of light rail service); 10 AR 4637–38 (alternatives including mass transit would not satisfy goals of the project). In the FONSI itself, the FHWA later provided a detailed response explaining why plaintiffs' suggestions were unreasonable. FONSI, Section 2, Part A, Response to Interest Group Comments, at 18–21. Specifically, the FHWA explained:

> The transit alternative as indicated above is not a reasonable stand-alone alternative, and achieves none of the basis purposes and needs of the project. Furthermore, a comprehensive examination of these options is far beyond the reasonable limits of this study. Professionals acquainted with transportation planning fully acknowledge that such an

endeavor requires years of analysis and planning; planning which is typically done on a regional or subarea basis. To assume that it can be done with any degree of credibility within the context of this environmental assessment is unreasonable Fundamentally, it is not the responsibility of the Iowa DOT or FHWA to develop transit plans for the region. It is only reasonable within the context of this assessment to examine facility plans that have been prepared by others.

Transit in the Des Moines metropolitan area is not considered sufficient by itself to accommodate either the existing or future travel demand. Transit usage in the area currently accounts for only a small proportion of daily work trips. Even the most optimistic projections of transit usage would not produce ridership of even five percent of the daily work trips. For example, in suburban counties of the Chicago metropolitan area, with substantially more mature transit services, public transit usage barely reaches 5 to 6 percent of the total work trips. Although transit is not viewed to be a stand alone alternative, it is still important as an element of the total transportation system. Along these lines, the travel forecasts used to assess future traffic conditions in the vicinity of the proposed interchange improvements reflect the incorporation of revised bus transit routes, use of ITS technology, and travel demand management strategies anticipated to reduce travel in 2025 by 10 percent. These measures will help to improve traffic operations on the system, but will not mitigate the traffic capacity problems that exist and are projected to occur in the future.

. . . . .

*Id.* at 19–20. Reasons for rejecting the no-build alternative also were thoroughly explained. *Id.* at 20–21.

As noted by defendants, there are numerous references to alternatives to the interchange improvements, along with justifiable reasons for rejecting these alternatives. *See* 2 AR 106–244 (1996 IJR for interchange at I–35 and what was then Fuller Road); 3 AR 539–40 (copy of supplement to April 2000 IJR for interchange at George Mills Civic Parkway and I–35); 5 AR 1507–1661 (July 2001 IJR for 74th Street and I–80); 6 AR 2183–95 (September 2001 Administrative Action IJR). Plaintiffs' argument regarding the alleged failure to consider specific alternatives is, therefore, without merit.

### 2. Count II

Count II of plaintiffs' complaint alleges defendants' conduct violated their property rights and due process rights under the Fourteenth Amendment. Complaint at ¶ 85. This Count was dismissed in its entirety in an Order issued contemporaneously with the present Order.

### 3. Conclusion Regarding Probability of Success on the Merits

Regardless of plaintiffs' attempts to characterize the issue to the contrary, the ultimate issue facing this Court is whether the FHWA's review of the environmental investigation and EA prepared by the City of West Des Moines, IDOT and their respective agents was arbitrary, capricious, violative of due process or otherwise unlawful. In an Order entered June 7, 2002, this Court initially evaluated plaintiff's various arguments and found plaintiffs were unlikely to succeed on the merits of either of the two counts pled in their Complaint.

Several months later, following a lengthy hearing, post-trial briefings and consideration of a seventeen-volume administrative record, the result is the same.

### D. Remaining *Dataphase* Factors

The Court evaluated the remaining *Dataphase* factors in its June 7, 2002 Order, and notes that plaintiffs have presented new evidence-the administrative record-and argument only with regard to the first factor. Accordingly, the Court reaffirms its prior analysis with regard to the remaining three factors, and incorporates this analysis into its present findings. All three of these factors, the threat of irreparable harm to plaintiffs, the balance between this harm and potential harm to others if relief is granted, and whether an injunction serves the public interest, weigh against granting preliminary injunctive relief.

### E. Defendants' Motion to Consolidate Final Hearing of the Action on the Merits with the Preliminary Injunction Hearing

On June 11, 2002, the City of West Des Moines and the state defendants filed a motion to consolidate the final hearing on the merits with the June 24, 2002 hearing on plaintiffs' motion for preliminary injunction. The federal defendants joined in the motion on June 12, 2002. At the time defendants filed their motion, the full administrative record had not yet been submitted, which caused plaintiffs to resist the motion for consolidation. Obviously, however, at this juncture there is no further evidence to be presented, and no barrier to the issuance of a final ruling. Under authority of Federal Rule of Civil Procedure 65(a)(2), which authorizes consolidation "[b]efore or after the commencement of the hearing of an application for a preliminary injunction," this Court grants defendants' motion, and directs that final judgment be entered in favor of defendants.

### III. CONCLUSION

For the reasons outlined above, plaintiffs' May 15, 2002 motion for preliminary injunction is denied. Plaintiffs' August 9, 2002 motion to expand the administrative record is granted. Plaintiffs' June 21, 2002 Objections to Magistrate's Order are rejected: Judge Walters' June 18, 2002 Order is neither clearly erroneous nor contrary to law. Lastly, defendants' June 11, 2002 motion to consolidate final hearing of the action on the merits with the preliminary injunction hearing is granted. The Clerk of Court is directed to enter final judgment in favor of all defendants and against plaintiff.

IT IS ORDERED.